FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Aug 31, 2021

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

JAMES C.,[1]

                Plaintiff,

      v.

KILOLO KIJAKAZI, Acting
Commissioner of Social Security,[2]

              Defendant.

No.   4:20-CV-5079-EFS

**ORDER DENYING PLAINTIFF'S
SUMMARY-JUDGMENT MOTION
AND GRANTING DEFENDANT'S
SUMMARY-JUDGMENT MOTION**

       Before the Court are the parties' cross summary-judgment motions.[3]

Plaintiff James C. appeals the denial of benefits by the Administrative Law Judge

---

[1] To protect the privacy of the social-security Plaintiff, the Court refers to him by

first name and last initial or as "Plaintiff." *See* LCivR 5.2(c).

[2] On July 9, 2021, Ms. Kijakazi became the Acting Commissioner of Social Security.

She is therefore substituted for Andrew Saul as Defendant. Fed. R. Civ. P. 25(d); 42

U.S.C. § 405(g).

[3] ECF Nos. 14 & 17.

(ALJ). He alleges the ALJ erred by 1) improperly considering certain medical opinions, 2) improperly discounting his symptom reports, and 3) improperly determining step five of the sequential disability evaluation based on an incomplete hypothetical question. In contrast, Defendant Commissioner of Social Security asks the Court to affirm the ALJ's decision finding Plaintiff is not disabled. After reviewing the record and relevant authority, the Court denies Plaintiff's Motion for Summary Judgment, ECF No. 14, and grants the Commissioner's Motion for Summary Judgment, ECF No. 17.

## I.    Five-Step Disability Determination

A five-step sequential evaluation process is used to determine whether an adult claimant is disabled.[4] Step one assesses whether the claimant is currently engaged in substantial gainful activity.[5] If the claimant is engaged in substantial gainful activity, benefits are denied.[6] If not, the disability evaluation proceeds to step two.[7]

Step two assesses whether the claimant has a medically severe impairment, or combination of impairments, which significantly limits the claimant's physical

---

[4] 20 C.F.R. § 416.920(a).

[5] *Id.* § 416.920(a)(4)(i).

[6] *Id.* § 416.920(b).

[7] *Id.* § 416.920(b).

or mental ability to do basic work activities.[8] If the claimant does not, benefits are denied.[9] If the claimant does, the disability evaluation proceeds to step three.[10]

Step three compares the claimant's impairment or impairments to several recognized by the Commissioner as so severe as to preclude substantial gainful activity.[11] If an impairment or combination of impairments meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.[12] If not, the disability evaluation proceeds to step four.

Step four assesses whether an impairment or impairments prevents the claimant from performing work he performed in the past by determining the claimant's residual functional capacity (RFC).[13] If the claimant can perform prior work, benefits are denied.[14] If the claimant cannot perform prior work, the disability evaluation proceeds to step five.

Step five, the final step, assesses whether the claimant can perform other substantial gainful work—work that exists in significant numbers in the national

---

[8] 20 C.F.R. § 416.920(a)(4)(ii).

[9] *Id.* § 416.920(c).

[10] *Id.*

[11] *Id.* § 416.920(a)(4)(iii).

[12] *Id.* § 416.920(d).

[13] *Id.* § 416.920(a)(4)(iv).

[14] *Id.*

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 3

economy—considering the claimant's RFC, age, education, and work experience.[15] If so, benefits are denied. If not, benefits are granted.[16]

The claimant has the initial burden of establishing he is entitled to disability benefits under steps one through four.[17] At step five, the burden shifts to the Commissioner to show the claimant is not entitled to benefits.[18]

## II.    Factual and Procedural Summary

Plaintiff filed a Title XVI application, at first alleging a disability onset date of January 15, 2011.[19] His claim was denied initially and upon reconsideration.[20] An administrative hearing was held by video before Administrative Law Judge Stewart Stallings.[21] At the video hearing, Plaintiff amended his alleged disability onset date to July 21, 2016.[22]

---

[15] 20 C.F.R. § 416.920(a)(4)(v); *Kail v. Heckler*, 722 F.2d 1496, 1497-98 (9th Cir. 1984).

[16] 20 C.F.R. § 416.920(g).

[17] *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).

[18] *Id.*

[19] AR 221-237.

[20] AR 146-150, 154-57.

[21] AR 44-87.

[22] AR 48. Plaintiff filed a prior Title XVI application in 2011 that was denied by an unfavorable decision dated September 11, 2014. That decision was affirmed by the

In denying Plaintiff's disability claim, the ALJ made the following findings:

- Step one: Plaintiff had not engaged in substantial gainful activity since July 21, 2016, the application date and amended alleged onset date.

- Step two: Plaintiff had the following medically determinable severe impairments: bilateral knee degenerative joint disease, status post surgeries to both knees; lumbar spondylarthritis; a depressive disorder; a bipolar disorder; and an anxiety disorder with panic and social phobia.

- Step three: Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.

- RFC: Plaintiff had the RFC to:

---

Appeals Council on May 17, 2016. The ALJ in this case found the presumption of continuing nondisability applicable to subsequent disability claims was rebutted because changed circumstances affected the issue of disability, including allegations of the existence of bipolar disorder that were not previously considered. AR 25. The Listing of Impairments was also revised since the prior unfavorable decision. AR 25. The ALJ also found new and material evidence meant he was not required to give effect to certain findings contained in the previous unfavorable ALJ decision. AR 25-26.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 5

perform a limited range of sedentary work as defined in 20 CFR 416.967(a). Specifically, the claimant can lift up to 10 pounds occasionally, stand or walk for about two hours, and sit for up to eight hours per eight-hour workday with normal breaks. The claimant cannot engage in foot control operations or climb ladders, ropes, or scaffolds, but can occasionally climb ramps and stairs and stoop. However, he can only rarely (defined as no more than 15 percent of the time) crouch, and cannot kneel or crawl. The claimant needs to avoid all use of moving or dangerous machinery and exposure to unprotected heights. The claimant also needs simple, routine work (although not necessarily unskilled work) in a low-stress job, meaning that he cannot engage in production pace work in which the pace of work is not worker-controlled. For example, he cannot do assembly-line work or work with sales quotas. In addition, the claimant can have no more than brief and superficial in-person interaction with the public and coworkers, and can have only occasional interaction with supervisors.

- Step four: Plaintiff has no past relevant work.

- Step five: considering Plaintiff's RFC, age, education, and work history, Plaintiff could perform work that existed in significant numbers in the national economy, such as call-out operator, circulation clerk, and typist.[23]

When assessing the medical-opinion evidence, the ALJ gave:

- great weight to the treating opinion of Deborah M. Rogers, ARNP, and the reviewing opinion of Donna M. Veraldi, Ph.D.

- partial weight to the examining opinion of Philip G. Barnard, Ph.D.

---

[23] AR 37-38.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 6

1

2

- little weight to the reviewing opinions of Joshua J. Boyd, Psy.D.,

Vincent Gollogly, Ph.D., Louis Martin, M.D., and J.D. Fitterer, M.D.[24]

The ALJ also found Plaintiff's medically determinable impairments could

reasonably be expected to cause some of his alleged symptoms, but his statements

concerning the intensity, persistence, and limiting effects of those symptoms were

not entirely consistent with the medical evidence and other evidence in the

record.[25]

Plaintiff requested review of the ALJ's decision by the Appeals Council,

which denied review.[26] Plaintiff timely appealed to this Court.

### III.    Standard of Review

A district court's review of the Commissioner's final decision is limited.[27] The

Commissioner's decision is set aside "only if it is not supported by substantial

evidence or is based on legal error."[28] Substantial evidence is "more than a mere

scintilla but less than a preponderance; it is such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion."[29] Moreover, because it is

---

[24] AR 30-36.

[25] AR 30-34.

[26] AR 1-6.

[27] 42 U.S.C. § 405(g).

[28] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012).

[29] *Id.* at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)).

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 7

the role of the ALJ and not the Court to weigh conflicting evidence, the Court

upholds the ALJ's findings "if they are supported by inferences reasonably drawn

from the record."[30] The Court considers the entire record.[31]

Further, the Court may not reverse an ALJ decision due to a harmless

error.[32] An error is harmless "where it is inconsequential to the [ALJ's] ultimate

nondisability determination."[33] The party appealing the ALJ's decision generally

bears the burden of establishing harm.[34]

## IV.    Analysis

### A.    Medical Opinions: Plaintiff fails to establish error.

Plaintiff challenges the ALJ's assignment of little weight to the opinion of

Phillip Barnard, Ph.D. Plaintiff further challenges the ALJ's consideration of the

---

[30] *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

[31] *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion," not simply the evidence cited by the ALJ or the parties.) (cleaned up); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered[.]").

[32] *Molina*, 674 F.3d at 1111.

[33] *Id*. at 1115 (cleaned up).

[34] *Shinseki v. Sanders*, 556 U.S. 396, 409-10 (2009).

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 8

testimony provided by Donna Veraldi, Ph.D. As discussed below, Plaintiff fails to establish the ALJ erred in weighing the medical-opinion evidence.

### 1.     Standard for Claims filed Before March 27, 2017

The weighing of medical opinions depends on the nature of the medical relationship, i.e., whether the medical provider is 1) a treating physician, 2) an examining physician who examined but did not treat the claimant, or 3) a reviewing physician who neither treated nor examined the claimant.[35] Generally, more weight is given to the opinion of a treating physician than to an examining physician's opinion, and the opinions of both treating and examining physicians are given more weight than the opinion of a reviewing physician.[36]

When a treating physician's or examining physician's opinion is not contradicted by another physician, it may be rejected only for "clear and convincing" reasons and, when it is contradicted, it may be rejected for "specific and legitimate reasons" supported by substantial evidence.[37] A reviewing physician's opinion may be rejected for specific and legitimate reasons supported by substantial evidence, and the opinion of an "other" medical source[38] may be

---

[35] *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014).

[36] *Id.*; *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995).

[37] *Lester*, 81 F.3d at 830.

[38] *See* 20 C.F.R. §§ 416.902, 416.913(a) (2011) (defining acceptable medical sources for claims filed before March 27, 2017).

rejected for specific and germane reasons supported by substantial evidence.[39] The opinion of a reviewing physician serves as substantial evidence if it is supported by other independent evidence in the record.[40]

2.    Dr. Barnard

On May 4, 2016, Dr. Barnard performed a psychological evaluation of Plaintiff.[41] Dr. Barnard diagnosed Plaintiff with dysthymic disorder, post-traumatic stress disorder (PTSD), and undifferentiated somatoform disorder.[42] Dr. Barnard opined that Plaintiff's pain would affect his ability to work to a severe extent, Plaintiff's depression would affect his ability to work to a moderate extent, and Plaintiff's anxiety would affect his ability to work to a mild extent.[43] As for basic work activities, Dr. Barnard opined Plaintiff had:

- "moderate" limitations in the following areas: understand, remember, and persist in tasks by following very short and simple instructions; learn new tasks; perform routine tasks without special supervision; adapt to changes in a routine work setting; make simple work-related

---

[39] *Molina*, 674 F.3d at 1111; *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009).

[40] *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).

[41] AR 371-76. The ALJ mistakenly stated the evaluation took place in April 2016. *See* AR 34.

[42] AR 373.

[43] AR 372.

decisions; be aware of normal hazards and take appropriate precautions; ask simple questions or request assistance; and set realistic goals and plan independently.[44]

- a "marked" limitation in his ability to understand, remember, and persist in tasks by following detailed instructions.[45]

- "severe" limitations in the following areas: perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances without special supervision; communicate and perform effectively in a work setting; maintain appropriate behavior in a work setting; and complete a normal workday and work week without interruptions from psychologically based symptoms.[46]

The ALJ stated that he gave "partial weight" to Dr. Barnard's opinion. In particular, the ALJ gave great weight to Dr. Barnard's opinion regarding the basic work activities for which Plaintiff had moderate limitations but gave little weight to Dr. Barnard's opinion as to the basic work activities for which Plaintiff had marked or severe limitations.[47] The ALJ said the weight given to these different parts of Dr. Barnard's opinion is consistent with the fact that Plaintiff engaged in

_____

[44] AR 373-74.

[45] AR 374.

[46] AR 373-374.

[47] AR 35.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

numerous activities of daily living. The ALJ also said the weight given to the different parts of Dr. Barnard's opinion was consistent with Dr. Barnard's largely unremarkable contemporaneous objective findings at the time of the evaluation. The ALJ concluded the "more functionally limiting aspects of Dr. Barnard's opinion appear inconsistent with the results of his psychological evaluation."[48]

Dr. Barnard's examining opinion is contradicted by Dr. Veraldi's reviewing opinion, which is supported by independent evidence.[49] For that reason, the ALJ

---

[48] AR 35.

[49] When explaining her view of the paragraph B criteria as applied to Plaintiff, Dr. Veraldi assessed only a mild limitation in the ability to understand, remember, and apply information. AR 63. Dr. Veraldi also assessed a moderate limitation in social functioning as there was no evidence that Plaintiff acted on the anger and irritability he noted. AR 64-65. Dr. Veraldi also assessed only a moderate limitation in the ability to concentrate, persist, and maintain pace. AR 65-66. Dr. Veraldi also said Plaintiff was only moderately limited in his ability to adapt and manage himself. AR 66-67. Independent evidence supporting these findings includes but is not limited to the following: Plaintiff completed some college coursework, Plaintiff completed mental health court (a rigorous and stressful experience for him), Plaintiff has recognized when his mental health symptoms are worsening and sought appropriate help, and Plaintiff had largely unremarkable mental status exams in 2017. *See* AR 606, 646.

may reject it for "specific and legitimate reasons" supported by substantial evidence.[50]

One reason the ALJ discounted Dr. Barnard's opinion—rendered after a single evaluation of Plaintiff—was because it was inconsistent with Dr. Barnard's own largely unremarkable contemporaneous objective findings. Plaintiff argues that "unremarkable" objective findings are not a proper basis upon which to reject the opinion because psychological symptoms rarely have objective findings and, in any case, there are repeated objective findings in Plaintiff's case.[51] Plaintiff notes that the ALJ himself "acknowledge[d] findings of depressed mood, blunted affect, poor or intermittent eye contact, irritability, being uncooperative, sad/anxious appearance, and psychomotor retardation."[52] But the ALJ did not find that Plaintiff had *no* objective findings of psychological symptoms; rather, he found that Plaintiff had largely unremarkable *contemporaneous* objective findings *at the time of Dr. Barnard's evaluation*.[53] In other words, the ALJ concluded Dr. Barnard's opinion was inconsistent with the results of his own evaluation—the only evaluation of Plaintiff that Dr. Barnard completed.

---

[50] *Lester*, 81 F.3d at 830.

[51] ECF No. 14 at 9.

[52] ECF No. 14 at 9.

[53] AR 35.

1

2       A psychologists' opinion may be based on clinical interviews and mental

3   status exams in combination with a claimant's self-reports.[54] However, an ALJ may

4   discount an opinion that is inadequately supported by medical findings and

5   observations.[55] Moreover, "[a] physician's opinion can be discredited based on

6   contradictions between the opinion and the physician's own notes."[56] Here,

7

8

9       [54] *Buck v. Berryhill*, 869 F.3d 1040, 1045 (9th Cir. 2017) (psychologist's opinion was

10  based on a clinical interview and mental status evaluation and partially relied on

11  the claimant's self-reports; partial reliance on self-reported symptoms was not a

12  valid reason to reject the opinion).

13      [55] *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009)

14  (recognizing that a medical opinion may be rejected if it is conclusory or

15  inadequately supported); *Lingenfelter*, 504 F.3d at 1042 (recognizing that a medical

16  opinion is evaluated as to the amount of relevant evidence that supports the

17  opinion, the quality of the explanation provided in the opinion, and the consistency

18  of the medical opinion with the record as a whole); *Crane v. Shalala,* 76 F.3d 251,

19  253 (9th Cir. 1996).

20      [56] *Id.* at 1050; *see also Baker v. Saul*, 836 F. App'x 526, 528 (9th Cir. 2020)

21  (unpublished) (noting that the psychologist had only met with the claimant once

22  and "[t]he ALJ compared [the psychologist]'s conclusions to the doctor's own notes,

23  which indicated that Baker performed within the normal limits for six of the eight

    "additional detail" categories on the mental status exam.").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Dr. Barnard assessed various "marked" and "severe" limitations despite express findings from the "additional detail" categories of the mental status exam that Plaintiff was within normal limits in the six out of eight categories: thought process and content, orientation, perception, memory, fund of knowledge, and abstract thought.[57] Dr. Barnard found Plaintiff was not within normal limits in two categories: concentration and insight and judgment.[58] Even there, however, with respect to concentration, while Plaintiff could not complete serial sevens, Dr. Barnard noted only a "Mild range of impairment" with respect to Parts A and B of Halstead's Trail Making Test and also noted results within normal limits on the TOMM.[59] With respect to insight and judgment, Dr. Barnard checked that Plaintiff's insight and judgment were not within normal limits but then provided the following inconsistent notes:

> Mr. _____'s insight is fair. On the judgement item of what he would do if he smelled smoke in a crowded theater, he replied, "Find the emergency exit and help people get out – find the source."

In short, the ALJ rationally characterized the results of the mental status exam as "largely unremarkable." The inconsistency between those largely unremarkable findings and the marked and severe limitations assessed by

---

[57] AR 375.

[58] AR 375.

[59] AR 375.

1

2

Dr. Barnard was a specific and legitimate reason supported by substantial

evidence to reject Dr. Barnard's opinion.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

As for activities of daily living, an ALJ may discount a medical opinion that

is inconsistent with the claimant's level of activity or if claimant's activities are

easily transferable to the workplace environment.[60] But "many home activities are

not easily transferable to what may be the more grueling environment of the

workplace."[61] Here, the ALJ did not specify the activities he relied upon as being

inconsistent with Dr. Barnard's opinion. The ALJ instead made a general reference

to activities of daily living mentioned elsewhere in the opinion. The Court is limited

to addressing the reasons articulated by the ALJ for discounting Dr. Barnard's

opinion.[62] It is difficult for this Court to meaningfully review the ALJ's finding in

this regard without knowing the activities upon which the ALJ relied. Nonetheless,

even if the ALJ erred by discounting Dr. Barnard's opinion based on activities of

daily living, any error was harmless because, as explained above, the ALJ offered

another clear and convincing reason for rejecting Dr. Barnard's opinion—that it

17

18

19

20

21

22

23

[60] *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001); *Fair v. Bowen*, 885 F.2d

597, 603 (9th Cir. 1989).

[61] *Fair*, 885 F.2d at 603.

[62] *See Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (recognizing court

review is constrained to the reasons the ALJ asserts).

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 16

was inconsistent with his unremarkable findings.[63] As explained above, after performing a mental status exam, Dr. Barnard concluded Plaintiff was within normal limits in six out of eight categories. Moreover, the two categories for which Dr. Barnard said Plaintiff was not within normal limits contained contradictory notes. The ALJ's decision to discount Dr. Barnard's opinion is supported by substantial evidence, including the opinion of Dr. Veraldi, discussed below, and two other mental status exams performed by Plaintiff's counseling center in 2017.[64]

---

[63] *See Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008) (requiring the error to be consequential to the disability analysis).

[64] AR 606 (noting the following: intermittent eye contact, normal posturing, some psychomotor retardation, fluent speech at an appropriate rate with low volume, goal-directed and linear thought process, no suicidal or homicidal ideation, no intent or plan, no evidence of paranoia, delusions, or ideas of reference, depressed mood, restricted range and mood-congruent affect, alert and awake, fully oriented, fair insight/judgment), AR 646 (noting that Plaintiff was calm, cooperative polite, described his mood as struggling with racing thoughts, euthymic affect, interacted well, had normal body posturing with no abnormal movements, made intermittent eye contact, had normal, clear, articulated speech with normal rate and volume, and thought process was goal directed and logical).

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 17

3.    <u>Dr. Veraldi</u>

Dr. Veraldi reviewed the medical evidence of record and testified at the video hearing. Dr. Veraldi agreed that Plaintiff had depression and anxiety but did not see clear signs of PTSD.[65] She also noted that the record did not reveal any documentation of a manic episode, but that Plaintiff would meet the criteria of bipolar disorder based on the symptoms he endorsed.[66] With respect to the paragraph B criteria as applied to Plaintiff, Dr. Veraldi assessed the following:

- mild limitation in the ability to understand, remember, and apply information;[67]

- moderate limitations in the following: social functioning;[68] the ability to concentrate, persist, and maintain pace;[69] and the ability to adapt and manage himself.[70]

Dr. Veraldi ultimately concluded Plaintiff should be limited to simple, routine, repetitive work due to concentration issues, with limited interaction with

---

[65] AR 59, 63.

[66] AR 59-61.

[67] AR 63.

[68] AR 64-65.

[69] AR 65-66.

[70] AR 66-67.

co-workers and supervisors and no crowds.[71] Dr. Veraldi said Plaintiff should be in a low-stress job, so he should not engage in production-type work.[72]

The ALJ assigned great weight to Dr. Veraldi's opinion. Plaintiff, however, argues the ALJ did not capture all of Dr. Veraldi's opined limitations. Plaintiff argues the ALJ did not limit Plaintiff to simple, routine, and repetitive work as Dr. Veraldi opined, did not include Dr. Veraldi's explanation that Plaintiff's depression would fluctuate, and did not include Dr. Veraldi's explanation that Plaintiff would at times have marked impairments. Plaintiff also alleges the ALJ did not account for Dr. Veraldi's testimony that she had not considered Plaintiff's physical pain in her analysis, which Plaintiff says is an additional factor affecting concentration and pace.[73]

"[T]he ALJ is responsible for translating and incorporating clinical findings into a succinct RFC."[74] Plaintiff is correct that the ALJ limited Plaintiff to simple, routine work, but did not include the word "repetitive" in the RFC. Plaintiff submits the failure to include "repetitive" was error. The ALJ explained his intentional omission of "repetitive" at the hearing, however. In response to the vocational expert's question about whether Plaintiff was limited to unskilled work,

---

[71] AR 67.

[72] AR 68.

[73] ECF No. 14 at 11.

[74] *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1006 (9th Cir. 2015).

the ALJ said he was aware that Dr. Veraldi said repetitive, but that "it's more from anxiety, a low stress kind of work rather than any limitations because of intellectual capacity or ability to do skilled work."[75] Hence, the ALJ ultimately limited Plaintiff to "simple, routine work (although not necessarily unskilled work) in a low stress job."[76] This is a rational incorporation of Dr. Veraldi's opinion.[77]

Plaintiff additionally argues the ALJ's decision did not properly include Dr. Veraldi's explanation that Plaintiff's depression would fluctuate. Dr. Veraldi indeed testified that Plaintiff's depression "fluctuates as major depressive disorder does." But Plaintiff does not articulate how this should have changed the RFC crafted by the ALJ, which already restricted Plaintiff to a limited range of sedentary work with additional limits on social interaction, pace, and stress to accommodate Plaintiff's limitations related to his depression.[78]

Plaintiff argues the ALJ did not include Dr. Veraldi's explanation that Plaintiff would at times have marked impairments. But this is not an accurate representation of Dr. Veraldi's opinion. Dr. Veraldi did not definitively state that Plaintiff would experience marked limitations. Rather, she stated that, "depending on how much he's angry and irritable, and how serious his social phobia is,

---

[75] AR 80.

[76] AR 30.

[77] *See Rounds*, 807 F.3d at 1006.

[78] *See* AR 30.

obviously that gets him up into marked."[79] In other words, Dr. Veraldi was noting the possibility of a marked limitation, not the existence of one. Plaintiff has not pointed to medical evidence establishing that he gets so angry and irritable or that his social phobia is so extensive that he reaches a marked limitation.

Finally, Plaintiff argues the ALJ failed to address Dr. Veraldi's statement that she did not consider Plaintiff's chronic pain and depression together when making her assessment about Plaintiff's limitations related to concentration, persistence, and pace. Essentially, Plaintiff argues that, by relying on Dr. Veraldi's opinion, the ALJ also failed to consider the combined effects of Plaintiff's chronic pain and depression. Plaintiff says his physical pain is an obvious additional factor that affects his concentration. As a general matter, chronic pain should be factored into an ALJ's analysis concerning the effects of a mental disorder, as the effects of pain are not always easily separated from the effects of a mental disorder.[80] That means the effects of chronic pain should be considered in combination with the effects of mental disorders such as depression and anxiety. Here, however, there is

---

[79] AR 64.

[80] *See Lester*, 81 F.3d at 829-30 (noting that, for claimant with chronic pain syndrome and affective disorder, the consequences of the physical and mental impairments were inextricably linked and the Commissioner "erred as a matter of law in isolating the effects of [the claimant's] physical impairment from the effects of his mental impairment").

no indication the ALJ failed to do so. Rather, and as explained below, the ALJ discounted Plaintiff's testimony about the intensity, persistence, and limiting effect of his physical symptoms, including his knee and back pain. Thus, while the ALJ considered Plaintiff's pain, he did not find it as limiting as alleged. For the reasons explained below, the ALJ's finding in this regard was supported by substantial evidence.

Plaintiff fails to establish error with respect to the ALJ's consideration of the medical-opinion evidence.

## B.    Plaintiff's Symptom Reports: Plaintiff fails to establish consequential error.

Plaintiff argues the ALJ failed to provide valid reasons for rejecting his symptom reports. When examining a claimant's symptoms, the ALJ utilizes a two-step inquiry. "First, the ALJ must determine whether there is objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."[81] Second, "[i]f the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if [the ALJ] gives 'specific, clear and convincing reasons' for the rejection."[82] General findings are insufficient;

---

[81] *Molina*, 674 F.3d at 1112.

[82] *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (quoting *Lingenfelter*, 504 F.3d at 1036).

rather, the ALJ must identify what symptom claims are being discounted and what evidence undermines these claims.[83] "The clear and convincing standard is the most demanding required in Social Security cases."[84] Therefore, if an ALJ does not articulate specific, clear, and convincing reasons to reject a claimant's symptoms, the corresponding limitations must be included in the RFC.[85]

Factors to be considered in evaluating the intensity, persistence, and limiting effects of a claimant's symptoms include: 1) daily activities; 2) the location, duration, frequency, and intensity of pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; 5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; 6) any non-treatment measures the

---

[83] *Id.* (quoting *Lester*, 81 F.3d at 834), and *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (requiring the ALJ to sufficiently explain why he discounted claimant's symptom claims)).

[84] *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

[85] *Lingenfelter*, 504 F.3d at 1035 ("[T]he ALJ failed to provide clear and convincing reasons for finding Lingenfelter's alleged pain and symptoms not credible, and therefore was required to include these limitations in his assessment of Lingenfelter's RFC.").

claimant uses or has used to relieve pain or other symptoms; and 7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.[86] The ALJ is instructed to "consider all of the evidence in an individual's record" to "determine how symptoms limit ability to perform work-related activities."[87]

With respect to physical symptoms, Plaintiff testified that he suffered an adolescent knee injury that has since caused him pain. Plaintiff testified that he has had three surgeries to his left knee and one to his right. Plaintiff stated that his legs are stiff and feel as though they are on fire when he wakes up. He also stated he experiences daily pain and swelling in his knees which is made worse by activity and for which he must daily elevate his legs. Plaintiff testified to difficulty walking and said he cannot stand in one place for 60 seconds without pain. Plaintiff stated that he uses ice packs and ibuprofen multiple times per day to treat his pain. Plaintiff also stated that he suffers low back pain for which he uses daily Epsom salts or hot pads. He states his leg and back pain is made worse by sitting, standing, crouching, bending, twisting, and lifting/carrying a weight equal to a gallon of milk and that he cannot do any of these activities on a repeated basis for 2-3 hours out of an 8-hour workday. Plaintiff also testified that he is typically in a resting posture with his legs elevated for 75 percent of the day.

---

[86] SSR 16-3p, 2016 WL 1119029, at *7; 20 C.F.R. § 416.929(c).

[87] SSR 16-3p, 2016 WL 1119029, at *2.

With respect to mental symptoms, Plaintiff testified to volatile mood swings, being sent into a dangerous rage by trivial events, becoming confrontational with strangers over misperceived slights, intensifying depression and manic phases characterized by grandiose ideas, the inability to be still, and incoherent speech. Plaintiff also testified to inexplicably feeling like he hates his fiancé, poor sleep, and feeling aimless.

1.    Physical Symptoms

Here, the ALJ found Plaintiff's statements concerning the intensity, persistence, and limiting effects of his physical symptoms were inconsistent with his improvement with treatment, the objective medical evidence, and his activities of daily living.[88]

a.    *Improvement with Treatment*

An ALJ may discount a claimant's reported symptoms if they improved with treatment.[89] Here, the ALJ said, "the medical evidence of record shows consistent reports of improvements in [Plaintiff's] physical symptoms with treatment such that he is satisfactorily able to perform household responsibilities and activities of

---

[88] AR 32-33.

[89] The effectiveness of treatment is a relevant factor in determining the severity of a claimant's symptoms. 20 C.F.R. § 416.913(c)(3); *Morgan v. Comm'r of Social Sec. Admin.*, 169 F.3d 595, 599–600 (9th Cir. 1999) (considering evidence of improvement).

daily living."[90] The ALJ did not provide further discussion on this point but did cite accurately to many notes in the medical record stating that Plaintiff had reported improvement, was satisfied with his current therapy, and could perform household responsibilities and activities of daily living to his satisfaction.[91]

The ALJ's finding that Plaintiff improved with treatment is rational and supported by substantial evidence in the overall record. In addition to the reports of improvement noted by the ALJ, Plaintiff reported doing well on many occasions and noted frequently that his pain was well-controlled.[92] Sometimes Plaintiff's pain

---

[90] AR 32.

[91] AR 32.

[92] AR 415-16 (December 2015 treatment note states, "The patient reports he has had a decrease in pain and has been able to do more activities" and "He states the pain medication is working well" and "patient reports the current regimen is working well to control his pain and even states he feels his pain has decreased"); AR 412 (January 2016 treatment note says "He reports that Oxycodone has been the first pain medication that has worked well for his pain with little to no side effects. He has been working for his cousin driving a tractor. He feels with the oxycodone he can function quite well."); AR 544 (October 2016 treatment note says "He states that he still has knee pain [after corticosteroid injection] however he is doing alright with his current pain medication" and "James is doing well"); AR 660 (February 2017 treatment note says Plaintiff is getting 8 hours of sleep, has good

worsened, but the overall record reveals that Plaintiff generally responded well to targeted treatment and generally felt good when he was taking his medication as prescribed.[93] Notably, Plaintiff in 2017 reported that his pain medication was beneficial and made him functional and the day bearable.[94] His treatment providers made similar comments. In a September 2017 note, a treating physician wrote that, "He remains stable from a pain/functionality perspective with the current medication regimen."[95]

---

energy, good appetite, he is taking his medications and "they are working" and "he feels like his medications are doing well" and "He feels good about how he is doing."); AR 729 (June 2017 treatment note states, "James states he is overall doing well"); AR 723 (August 2017 treatment note states "He is doing well on his current regimen therefore I recommend no changes at this time");

[93] *See, e.g.*, AR 435 (July 2015 treatment note states Plaintiff had 80% pain relief after right and left steroid injection; felt so good that he went on numerous walks and hikes, ultimately re-injuring the knee); AR 428 (August 2015 treatment note stating Plaintiff reported improvement in walking, bending, and standing after left and right knee corticosteroid injections); AR 742 (March 2017 treatment note stating Plaintiff had 60% pain relief after right genicular nerve block and had improvement in range of motion, walking, standing, and sitting).

[94] AR 745.

[95] AR 720.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

The ALJ's finding that Plaintiff improved with treatment is supported by substantial evidence in the overall record, including the above-cited evidence that was not expressly discussed by the ALJ.[96] Plaintiff's improvement with treatment—noted by Plaintiff's treating providers and Plaintiff himself—was a clear and convincing reason to discount Plaintiff's testimony regarding his physical symptoms and their limiting effects.

b.    *Objective Medical Evidence*

As for the ALJ's finding that Plaintiff's symptom reports were inconsistent with the objective medical evidence, symptom reports cannot be discounted on the sole ground that they were not fully corroborated by the objective medical evidence.[97] However, objective medical evidence is a relevant factor in considering the severity of the reported symptoms.[98] Here, the ALJ found that consistent

---

[96] *See Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion," not simply the evidence cited by the ALJ or the parties.) (cleaned up); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered[.]").

[97] *See Rollins*, 261 F.3d at 857.

[98] Objective medical evidence means signs, laboratory findings, or both. 20 C.F.R. § 416.902(k). In turn, "signs" are defined as:

findings of grossly intact 5/5 strength of the bilateral lower extremities were inconsistent with Plaintiff's claim that he cannot perform even the limited range of sedentary work set forth in the RFC.[99] The ALJ also noted that Plaintiff "had some findings of normal gait."[100] While the ALJ did not misstate these objective findings, he has taken them out of context. Context is crucial as "treatment records must be viewed in light of the overall diagnostic record."[101] An ALJ may not cherry pick evidence to support a conclusion while ignoring other competent evidence in the

---

one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from [the claimant's] statements (symptoms). Signs must be shown by medically clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception, and must also be shown by observable facts that can be medically described and evaluated.

*Id.* § 416.902(l). Evidence obtained from the "application of a medically acceptable clinical diagnostic technique, such as evidence of reduced joint motion, muscle spasm, sensory deficits, or motor disruption" is considered objective medical evidence. 3 Soc. Sec. Law & Prac. § 36:26, Consideration of objective medical evidence (2019).

[99] AR 32.

[100] AR 32.

[101] *Ghanim*, 763 F.3d at 1164.

1

2

3

4

5

6

7

8

9

10

11

12

13

record.[102] While bilateral strength of the lower extremities is a relevant factor for the ALJ to consider, so are other factors. For example, Plaintiff's range of motion in the lower extremities is relevant, but the ALJ did not discuss objective findings related to range of motion. This matters here because while strength was consistently noted at 5/5, Plaintiff showed decreased range of motion that waxed and waned with treatment.[103] The ALJ should have considered all relevant factors, not simply those that support a finding of nondisability.

The ALJ also noted that Plaintiff had "some findings of normal gait." But Plaintiff's treatment providers also frequently (more than 15 times) noted that he presented with an antalgic gait.[104] The ALJ's reliance on "some findings of normal gait" thus ignores the overall diagnostic record.

---

14

15

16

17

[102] *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984) (cleaned up) ("Although it is within the power of the Secretary to make findings concerning the credibility of a witness …, he cannot reach a conclusion first, and then attempt to justify it by ignoring competent evidence in the record that suggests an opposite result.").

18

19

20

21

[103] *See, e.g.*, AR 348 (2015: decreased ROM in right knee); AR 353 (2015: right knee could not tolerate manual exam for ROM); AR 389 (2016: limited active and passive ROM); AR 410 (2016: "crepitus noted in the Bilateral knees with decreased ROM"); AR 742 (2017: significantly improved ROM after genicular nerve block).

22

23

[104] AR 407, 410, 541, 544, 697, 714, 720, 723, 727, 731, 734, 737, 743, 746, 749, 752.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

   In short, while objective medical evidence is a relevant factor for the ALJ to consider, here, the ALJ selectively focused on some objective findings (strength of the lower extremities) while ignoring other, equally relevant findings (range of motion of the lower extremities). Moreover, the ALJ ignored the overall diagnostic record by ignoring frequent findings of Plaintiff's antalgic gait. Any error in considering this evidence was harmless, however, as the ALJ discounted Plaintiff's physical symptom testimony based on a clear and convincing reason supported by the record, as explained above.[105] Furthermore, while the ALJ overlooked Plaintiff's range of motion and gait limitations in rejecting his symptom testimony, the RFC accounted for these limitations by restricting Plaintiff to standing or walking for only two hours (and providing that he can sit for up to eight hours in an eight-hour workday), prohibiting foot control operations and climbing ladders,

---

[105] *See Carmickle*, 533 F.3d at 1162-63; *Molina*, 674 F.3d at 1115 ("[S]everal of our cases have held that an ALJ's error was harmless where the ALJ provided one or more invalid reasons for disbelieving a claimant's testimony, but also provided valid reasons that were supported by the record."); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004) (holding that any error the ALJ committed in asserting one impermissible reason for claimant's lack of credibility did not negate the validity of the ALJ's ultimate conclusion that the claimant's testimony was not credible).

ropes, or scaffolds, and restricting him to rare crouching with no kneeling or crawling.

          *c.*     *<u>Activities of Daily Living</u>*

      If a claimant can spend a substantial part of the day engaged in pursuits involving the performance of exertional or non-exertional functions, the ALJ may find these activities inconsistent with the reported disabling symptoms.[106] The ALJ highlighted that Plaintiff:

- Could sometimes help with cooking and chores such as laundry and washing dishes.

- Did not require help with self-care.

- Could walk his dog.

- Was told by treatment providers to engage in aerobic exercise.

- Traveled to Seattle for a rheumatologist appointment in February 2017.

- Went house hunting with his fiancé in March 2017.

- Purchased a home and thereafter kept busy gathering items for the house and doing house-related work.

- Watched his niece three days per week for a period of time.

- Traveled to Seattle and attended an NFL game.

- Took a trip to the Oregon coast.

---

[106] *Molina*, 674 F.3d at 1113.

Importantly, "disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations."[107] Moreover, "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication."[108] For these reasons, activities of daily living bear on a claimant's symptom reports only if the level of activity is inconsistent with the individual's claimed limitations.[109]

Here, many of the activities cited by the ALJ are not inconsistent with disability. For example, the ability to occasionally help with cooking and laundry—activities that do not take up a substantial part of the day—is not inconsistent with disability, nor is the fact that Plaintiff did not require assistance to care for himself. Further, it would be inappropriate to penalize Plaintiff for traveling to Seattle to seek medical care for the very problems that cause him pain, especially given the appointment was not a recurring appointment.

As for Plaintiff's engagement in house hunting, gathering house-related items, and watching his niece three days per week, the ALJ was without sufficient information about these activities to determine whether they were inconsistent

---

[107] *Reddick*, 157 F.3d at 722 (citations omitted).

[108] *Smolen*, 80 F.3d at 1287 n.7.

[109] *Reddick*, 157 F.3d at 722.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

with Plaintiff's claimed limitations. It is improper to make assumptions about what these activities entailed. Rather, it would be appropriate to find these activities are inconsistent with Plaintiff's claimed limitations only if the record so demonstrated. Nothing in the record explains what childcare activities Plaintiff engaged in or what he meant by his statement that he "watched" his niece.[110] Likewise, nothing in the record explains what Plaintiff meant by "house hunting" and whether any house hunting took up a substantial portion of Plaintiff's day. Absent this information, the ALJ cannot properly find these activities are inconsistent with Plaintiff's claimed limitations.

As for walking his dog, the Ninth Circuit has "repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, *or limited walking for exercise*, does not in any way detract from h[is] credibility as to h[is] overall disability."[111] There is no evidence in the

---

[110] *See Trevizo v. Berryhill*, 871 F.3d 664, 682 (9th Cir. 2017) (although claimant engaged in child-care activity, nothing in the claimant's records revealed "an adequately specific conflict with her reported limitations.").

[111] *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) (emphasis added) (Ms. Vertigan could grocery shop without assistance, walk approximately an hour in the malls, play cards, swim, watch television, and read, but these activities did not consume a substantial part of her day and so did not detract from her credibility).

record that Plaintiff walks his dog for a substantial part of the day. Therefore, this activity is not a valid reason to reject Plaintiff's symptom testimony.

As for being told by treatment providers to engage in aerobic exercise, this is also not a valid reason to reject Plaintiff's symptom testimony. "A patient may [walk or swim] despite pain for therapeutic reasons, but that does not mean she could concentrate on work despite the pain or could engage in similar activity for a longer period given the pain involved."[112]

Finally, as for the NFL game in Seattle and the 2017 trip to the Oregon coast, the record contains very few details about these events. The ALJ concluded attendance at the football game showed an intact ability to ambulate in a stadium as Plaintiff had described walking into the stands.[113] The ALJ did not explain the significance of the trip to the Oregon coast. In any case, even if reliance on these events was improper and the ALJ's reliance on activities of daily living was therefore an invalid basis upon which to reject Plaintiff's symptom reports, Plaintiff's improvement with treatment—reported by Plaintiff himself as well as his treating providers—was a specific, clear, and convincing basis upon which to

---

[112] *Id. at* 1050.

[113] AR 33.

find Plaintiff's symptoms were not as limiting as alleged.[114] Because the ALJ had a

clear and convincing basis upon which to reject Plaintiff's physical symptom

reports, reliance on additional, invalid grounds constitutes harmless error.[115]

2.    Mental Symptoms

The ALJ found Plaintiff's statements concerning the intensity, persistence,

and limiting effects of his mental symptoms were inconsistent with his

improvement with treatment, "numerous unremarkable findings" as to his mental

functioning, his activities of daily living, and the opinion of Dr. Veraldi that

Plaintiff's abnormal mental objective findings were often in the context of

significant stressors and that Plaintiff showed an ability to seek appropriate help

when his mental symptoms worsened.[116]

a.    *Improvement with Treatment*

The ALJ stated that "a finding of more than a moderate limitation in

[cognitive, social, and adaptive] functional areas during the course of the period at

issue is called into question by some reports of improvements in or stabilization of

---

[114] Notably, even though the ALJ validly discounted Plaintiff's symptom reports, he

still restricted Plaintiff to a limited range of sedentary work with additional

postural limitations.

[115] *See Carmickle*, 533 F.3d at 1162-63; *Molina*, 674 F.3d at 1115; *Batson*, 359 F.3d

at 1197 (9th Cir. 2004).

[116] AR 32-34.

the claimant's mental symptoms with medications."[117] The ALJ then cited to a counseling treatment note from May 2016 in which Plaintiff reported that he was doing well, even handling "bad things," and that his medications had been helpful.[118] The ALJ offered no further analysis or citation to evidence regarding Plaintiff's improvement with treatment. Nonetheless, the ALJ rationally found that Plaintiff did show improvement with treatment. For example, a counseling treatment note from March 2015 states that Plaintiff's moods were "in a good place" and he reported taking his medications appropriately.[119] In a counseling treatment note from October 2016 (a time in which Plaintiff was participating in mental health court), Plaintiff reported that he still had "some" anxiety but he was able to remove himself from the situation and calm down.[120] The same October 2016 treatment note provides that Plaintiff was consistently taking his medication and he felt he could control his anxiety well enough to decrease his medications.[121] Similarly, a March 2017 counseling treatment note states that Plaintiff had his

---

[117] AR 33.

[118] AR 379.

[119] AR 599.

[120] AR 670.

[121] AR 670.

usual amount of depression but felt it was within control and reported some

anxiety but said it was "doing pretty good."[122]

At other times, Plaintiff reported worsening symptoms. But Plaintiff often

expressly connected his symptoms to increasing stressors in his life, and especially

mental health court, which, according to treatment notes, he participated in

between 2015 and 2018. For example, in a counseling treatment note from

September 2015, Plaintiff reported that he felt mental health court was making his

anxiety worse.[123] A counseling treatment note from September 2016 provides that

Plaintiff stated he felt mental health court was dominating his life and he started

smoking again as a coping mechanism.[124] In November 2016, Plaintiff reported

that mental health court was very difficult for him and he had anger with the court

system. He expressed increased depression and panic attacks.[125] He also reported

that mental health court was very anxiety producing.[126] Also in November 2016,

Plaintiff voluntarily checked himself into the hospital for help with mental health

symptoms, and he reported mental health court was a contributing stressor.[127] A

---

[122] AR 647.

[123] AR 377.

[124] AR 583-84.

[125] AR 595.

[126] AR 676.

[127] AR 608.

treatment note from Plaintiff's voluntary inpatient stay provides that, "[Plaintiff] also talked about the court requiring him to be here and if he [k]new it was going to be this stressful he would not have agreed. Also [Plaintiff] feels that the court is discriminating against him because the court does not feel he is disabled and he feels that he is."[128] In March 2017, Plaintiff said mental health court impacts his self-esteem.[129] He reported obsessive thoughts and guilt in his relationship.[130] A counseling treatment note from June 2017 provides that Plaintiff "talked about anxiety related to going to the courthouse, feeling na[u]seous, worrying about the possibility of being thrown in jail again and not being able to do anything about it."[131] In August 2018, a counseling treatment note states that Plaintiff had been feeling very depressed for the past few weeks, but that he was happy to be moving toward the end of mental health court.[132] Despite Plaintiff's stress related to mental health court, Plaintiff reported at the hearing that he successfully finished the court program.[133] The ALJ rationally considered that treatment helped Plaintiff successfully complete mental health court, which was a court-ordered

---

[128] AR 614.

[129] AR 628.

[130] AR 628.

[131] AR 651.

[132] AR 585.

[133] AR 58.

obligation and for which Plaintiff faced jail time if he did not successfully complete the program.

Viewing the overall record, the ALJ's finding that Plaintiff's mental symptoms improved with treatment is supported by substantial evidence. As noted above, Plaintiff indicated on multiple occasions that his anxiety and depression were controlled, and his medications were helping him. While he did often report worsening symptoms, he frequently stated those symptoms were the product of, or were connected to, impermanent life stressors such as mental health court or house-hunting. Furthermore, even while Plaintiff was participating in mental health court, he reported being able to calm himself when he felt anxious. Indeed, during Dr. Barnard's psychological assessment of Plaintiff in 2016 (a time in which Plaintiff was participating in mental health court), Plaintiff said he considered himself "relatively stable" mentally.[134] In short, Plaintiff's improvement with treatment is well-supported in the record and was therefore a valid basis upon which the ALJ could reject Plaintiff's testimony regarding the intensity, persistence, and limiting effects of his mental symptoms.

b.    _Unremarkable Objective Findings_

The ALJ additionally noted "numerous unremarkable findings as to the claimant's mental functioning in the medical evidence of record."[135] The ALJ stated

---

[134] AR 371.

[135] AR 33.

that Plaintiff has been noted to present as alert and oriented with appropriate mood and affect, as euthymic with normal speech, behavior and thought content, and with goal-directed and logical thought process.[136] Again, symptom reports cannot be discounted on the sole ground that they were not fully corroborated by the objective medical evidence.[137] However, objective medical evidence is a relevant factor in considering the severity of the reported symptoms. Here, however, the above findings noted by the ALJ are of limited utility, as they are primarily nonrelevant normal findings related to cognition and demeanor observed by treatment providers during appointments for *physical* symptoms such as knee pain. Moreover, where the ALJ cited to counseling treatment notes, he focused on Plaintiff's demeanor rather than the substance of his symptomology related to anxiety and depression. For these reasons, the above "unremarkable findings" noted by the ALJ are not relevant to Plaintiff's mental symptom reports.[138]

---

[136] AR 33.

[137] *See Rollins*, 261 F.3d at 857.

[138] *Ghanim*, 763 F.3d at 1164 (finding the ALJ erred by rejecting the claimant's symptoms resulting from anxiety, depressive disorder, and PTSD on the basis that claimant performed cognitively well during examination and had a generally pleasant demeanor).

The ALJ later cited other "unremarkable" findings from a psychological evaluation performed in April 2016 by Dr. Barnard.[139] While findings from Dr. Barnard's psychological evaluation are undoubtedly relevant and were appropriately considered by the ALJ when determining whether to discount Plaintiff's mental symptom reports, those findings cannot serve as the sole reason for discounting Plaintiff's symptom reports. As discussed above, the ALJ's finding that Plaintiff's mental health improved with treatment is supported by substantial evidence and supplements the ALJ's unremarkable-objective-findings reason.

### c.    *Activities of Daily Living*

The ALJ also relied on Plaintiff's activities of daily living, finding they connoted "a more intact degree of cognitive, social, and adaptive functioning across the longitudinal period at issue."[140] The ALJ cited Plaintiff's ability to do the following activities: watch television for up to an hour at a time and play video games for up to two hours at a time, attend church, go fishing, and read.[141] These activities, however, are not inconsistent with Plaintiff's claims regarding his mental health symptoms. The cited activities are largely solitary, requiring limited, if any, social interaction, and permit Plaintiff to participate or engage at his leisure. The activities do not require extended concentration nor is there evidence

---

[139] AR 33-34.

[140] AR 33.

[141] AR 33.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

that they take up a substantial part of Plaintiff's day. For these reasons, the ALJ's finding that these activities are inconsistent with Plaintiff's symptom reports is not a rational finding supported by substantial evidence.

While not exactly an "activity of daily living," the ALJ also noted that Plaintiff was able to complete mental health court despite its stressful character.[142] The ALJ properly considered completion of mental health court as indicative of Plaintiff's adaptive functioning capabilities in the face of significant stress.

### d.   *Medical Opinions*

An ALJ may consider whether the claimant's symptoms are supported by the medical opinions.[143] Here, the ALJ considered and gave great weight to the opinion of Dr. Veraldi, who noted that Plaintiff's abnormal objective mental findings and increased symptomology were often in the context of significant stressors such as mental health court. The ALJ also considered Dr. Veraldi's testimony that Plaintiff showed an ability to recognize when he is experiencing increased mental symptomology and seek appropriate help. Dr. Veraldi also noted that nothing in the record documented a manic episode. The ALJ properly considered Dr. Veraldi's opinion when evaluating Plaintiff's symptom reports.

### 3.   Harmless Error

In summary, the ALJ erred in the following ways:

---

[142] AR 34.

[143] *Batson*, 359 F.3d at 1196.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

- By selectively citing evidence of the Plaintiff's lower extremity strength but ignoring other competent evidence in the overall record.

- By relying on Plaintiff's activities of daily living that are not inconsistent with Plaintiff's claimed physical or mental limitations.

- By relying on nonrelevant normal findings from physical treatment appointments to reject mental symptom testimony.

These errors are harmless, however, because the ALJ offered other clear and convincing reasons supported by substantial evidence for discounting Plaintiff's symptoms.[144] The ALJ's findings—that Plaintiff's physical and mental symptoms and abilities improved with treatment and that Plaintiff's mental health symptoms were inconsistent with Dr. Barnard's unremarkable objective findings, Dr. Veraldi's opinion, and Plaintiff's completion of mental health court—are supported by substantial evidence and demonstrate that the ALJ's errors were inconsequential to his nondisability determination.

## C.   RFC & Step Five: Plaintiff fails to establish error.

Plaintiff argues the ALJ failed to properly include all of his limitations into the RFC and, consequently, into the hypothetical presented to the vocational expert.

---

[144] *See Carmickle*, 533 F.3d at 1162-63; *Molina*, 674 F.3d at 1115; *Batson*, 359 F.3d at 1197 (9th Cir. 2004).

1

2

3

4

5

6

7

8

9

10

"[T]he ALJ is responsible for translating and incorporating clinical findings into a succinct RFC."[145] A mere diagnosis of an impairment, however, does not establish functional deficits.[146] Plaintiff's argument merely restates his earlier allegations of error, which are not supported by the record. The RFC properly accounted for the functional limitations supported by the record.[147]

At step five, the ALJ has the burden to identify specific jobs existing in substantial numbers in the national economy that claimant can perform despite their identified limitations.[148] At an administrative hearing, an ALJ may solicit vocational expert testimony as to the availability of jobs in the national economy.[149] A vocational expert's testimony may constitute substantial evidence of the number

11

12

13

14

15

16

17

18

19

20

21

22

23

---

[145] *Rounds*, 807 F.3d at 1006.

[146] *Key v. Heckler*, 754 F.2d 1545, 1549-50 (9th Cir. 1985).

[147] *See Magallanes v. Bowen*, 881 F.2d 747, 756-57 (9th Cir. 1989) (allowing ALJ to restrict hypothetical to those limitations supported by substantial evidence).

[148] *Johnson v. Shalala*, 50 F.3d 1428, 1432 (9th Cir. 1995). *See* 20 C.F.R. § 416.920(g).

[149] *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 2011).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

of jobs that exist in the national economy.[150] The ALJ's decision regarding the number of alternative occupations must be supported by substantial evidence.[151]

Here, Plaintiff says the ALJ set forth a hypothetical to the vocational expert that included issues of absenteeism and loss of production that the ALJ did not ultimately adopt as applicable to Plaintiff. Plaintiff submits this is error. However, an ALJ may—and often does—ask a range of hypotheticals to a vocational expert. Plaintiff cites no authority, and this Court is aware of none, that considering a hypothetical necessitates an ultimate finding on the relevant issue. Here, based on the hypothetical consistent with the RFC ultimately crafted by the ALJ, the vocational expert testified that there were available jobs in the national economy. The ALJ's RFC and step-five analysis is rational and supported by substantial evidence.

## V.    Conclusion

Accordingly, **IT IS HEREBY ORDERED**:

1.    The case caption is to be **AMENDED** consistent with footnote 2.

2.    Plaintiff's Motion for Summary Judgment, **ECF No. 14**, is **DENIED**.

3.    The Commissioner's Motion for Summary Judgment, **ECF No. 17**, is **GRANTED**.

---

[150] *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005).

[151]*Farias v. Colvin*, 519 F. App'x 439, 440 (9th Cir. 2013) (unpublished). *See Hill*, 698 F.3d at 1158.

4.      The Clerk's Office shall enter **JUDGMENT** in favor of Defendant.

5.      The case shall be **CLOSED**.

**IT IS SO ORDERED.**  The Clerk's Office is directed to file this Order and provide copies to all counsel.

**DATED** this 30th  day of August 2021.

                    s/Edward F. Shea
                    EDWARD F. SHEA
            Senior United States District Judge

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 47